GLICKSTEIN, Judge.
This is an appeal by the defendants from an adverse final judgment, following a trial by jury wherein the appellee/wife, Mrs. Brinson, was awarded $242,000 in compensatory damages and $1,500 in punitive damages against the driver who had fallen asleep after drinking beer, crossed the median of 1-95, and caused the head-on collision with the plaintiff, who was then rear-ended by other vehicles. Mrs. Brinson’s award was reduced to $199,500 because of offsets not connected with any negligence on her part, which the jury solely laid at appellee’s door. Mr. Brinson received $8,000 for his claim. A cross appeal was noticed but not pursued.
Although we have considered the three issues raised by appellant, we believe that only one bears any discussion; namely, Mrs. Brinson’s testimony that she went in front of an administrative law judge and received total disability as a result. The incident occurred in the following setting:
Q. Mrs. Brinson, do you presently receive disability from the State of Florida because of your injuries?
A. Yes, I do.
Q. How much do you receive?
A. $144.
Q. How often do you get that?
A. That’s monthly.
Q. When does that run out, if you know?
A. I don’t know.
Q. Have you applied to the Social Security Administration for permanent and total disability?
A. Yes, I have.
Q. And were you awarded permanent and total disability by the Social Security Administration?
A. Yes.
Q. And do you receive payments from the government because of your total disability?
A. Yes, I do.
Q. And how much do you receive from the Federal government because of that? A. $403.
Q. And did you have to go to an administrative law judge to get that decision?
A. Yes, I went in front of a law — administrative law judge.
That was the extent of the testimony. In his closing argument, plaintiffs’ counsel argued that the doctors say the plaintiff is totally disabled; then he went on:
And she’s getting total disability from social security, she’s been qualified for that, that’s been determined and the State of Florida determined that she’s totally disabled.
Appellant asked for a mistrial twice, based on the determination of disability by social security.
We take seriously appellant’s argument that mention of an administrative judge’s determination of total disability was error. We agree that it was. However, we also believe that it was harmless error.
Perhaps we shall not cover all of the bases that may exist in the record for determining it to be harmless error; but we shall discuss those that we perceive. First, the injuries in this high-speed head-on collision were so serious and so pervasive that a weaker or poorer healing person might *1312 have been a basket case. There is such scrambling of her brain functions that she cannot engage in any form of teaching again, in the opinion of Dr. Dickens, the neurologist who treated her from the time she was wheeled into the hospital, unconscious from the accident. He says her disability in that sense is total. We discount appellant’s emphasis upon her having been a teacher’s aide, not a teacher. Her functions included those associated with teaching students.
Mrs. Brinson was taken to the Broward General Hospital emergency room by ambulance. She was unconscious and incoherent. Dr. George May’s initial examination revealed multiple scalp lacerations and a severe head injury. Subsequently, it was learned by x-rays that she had sustained multiple pelvic fractures, fracture of the right heel bone, a comminuted fracture of the right kneecap, fracture of the right ankle, and a severe closed head injury. She was admitted to the intensive care unit.
Psychiatrists and neurologists also agreed that during her time in the hospital Mrs. Brinson had suffered organic brain syndrome with psychosis. She is not now psychotic but suffers from depression because of the injuries and the pain.
Also in evidence was a deposition of Dr. Lawton Smith, an ophthalmologist to whom Dr. Dickens had referred Mrs. Brinson. He said Mrs. Brinson’s abnormal eye movements, blurred vision, double vision and limitation of gaze reflected an aberrant regeneration of the right third cranial nerve, which constituted a permanent injury. Her double vision was permanent. Before the accident, Mrs. Brinson had been somewhat nearsighted, but otherwise her vision had been normal.
Dr. May described the ankle fracture as a pylon fracture — one in which the talus had been driven up through the distal portion of the tibia by the force exerted on the bottom of the foot. The tibia was commi-nuted, meaning broken up into numerous small pieces. There were fractures on the surface that forms the joint. On a one-to-four scale of severity, the most severe being four, this fracture was graded four. Dr. May called this fracture a “devastating injury.” It was not possible to operate on this injury for five or six days, because of Mrs. Brinson’s head injury. Mrs. Brinson remained in traction, after the operation was done, for almost the whole remaining two months of her hospitalization. There was testimony that the ankle has healed, but the bone fragments are not in the position they were in before the fracture. Mrs. Brinson does not have the ability to position the foot normally — it always points out somewhat. She has limited ability to stand and walk. She also has arthritis in the ankle joint, caused by the accident, which is expected to grow worse over time.
There was evidence Dr. May had recommended fusion of the ankle to reduce the pain, and that Mrs. Brinson had refused the operation because of fear of serious harm. There was the possibility that injury to blood vessels in the foot during such an operation or severe swelling after the operation could result in loss of the foot.
Mrs. Brinson for a time wore an ankle brace on Dr. May’s recommendation, but could not get it repaired when it broke and claimed she could not afford to replace it.
According to Dr. May’s testimony, Mrs. Brinson’s ankle, foot and knee sustained permanent injuries. He knew she was a teacher’s aide; but did not know exactly what her duties were. He assumed her supervision of children would entail some standing and some sitting and did not think she could stand for a prolonged time such as forty-five minutes or an hour.
We understand appellant’s concern; namely, that the jury might take the administrative law judge’s determination of permanent total disability as gospel in determining the extent of Mrs. Brinson’s injuries. Yet there was no objection to the earlier questions wherein she testified that she receives $403 per month from the Federal government for total disability. The defendant apparently saw some benefit not to object at that point.
The question was hardly a highlight of the trial, in light of all that we have described of Mrs. Brinson’s horrendous injuries. No one in his right mind would expe *1313 rience by choice what Mrs. Brinson has experienced, does experience, and will experience, for the award she received, or for any award, for that matter.
The jury could observe Mrs. Brinson and make up their own minds, after hearing the testimony, about what she could and could not do. Plaintiffs’ counsel suggested no specific figure for compensatory damages. The defense argued that the case was not worth a penny more than $75,000. It did not take a Rhodes scholar to understand the extent and effect of Mrs. Brinson’s graphic injuries in an understanding way. How the mention of an administrative judge in one breath could distract the jury from all they had heard and seen of devastating head and bodily injuries or otherwise prejudice the defendant in this case eludes us. We trust, however, that plaintiffs’ lawyers will not elicit such testimony in the future, as the fact that it was harmless error here is hardly justification for overkill in the next case; and it could well be fatal to an otherwise well-tried case for a terribly injured client — to say nothing of the inexcusable double burden by retrial on a taxpayer-funded judicial system.
GUNTHER and STONE, JJ., concur.